# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

HAMILTON SCHOOL DISTRICT,

        Plaintiff,

      v.                                 Case No. 04-C-876

JANIE DOE, by her parents and next friends,
JOHN DOE and JANE DOE,

        Defendants.

---

## DECISION AND ORDER

---

     The defendant in this action, Janie Doe ("Janie" or "the student"), who proceeds by her parents, John and Jane Doe ("the Does")[1], is a school age resident of Hamilton School District ("Hamilton" or "the district"). On March 26, 2004, the Does filed a request for a hearing with Hamilton and alleged that Hamilton had discriminated against Janie Doe because of a disability, in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Hamilton retained Mark J. Kaiser to serve as an impartial hearing officer pursuant to 34 C.F.R. § 104.36. The hearing officer conducted a hearing from July 6-8, 2004, and in an order dated August 18, 2004, concluded that Hamilton had violated § 504.

     On September 13, 2004, Hamilton commenced this action by filing a complaint seeking review of the hearing officer's decision. In their answer, the defendants set out a counterclaim alleging that Hamilton has failed to provide Janie Doe with reasonable accommodations in violation

---

[1] On November 30, 2004, this court granted the plaintiff's unopposed motion to proceed using pseudonyms.

of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. In accord with the briefing schedule issued by this court, the issues are now fully briefed and ready for decision.

## I. SECTION 504

**A. STANDARD OF REVIEW**

The standard of review of an administrative decision under § 504 has not been clearly defined. The defendants argue that this court should apply a standard like that applied in cases arising under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. However, the IDEA contains specific provisions pertaining to the admission of new evidence, which affect the standard of review, and which § 504 lacks. 20 U.S.C. § 1415(i)(2)(C); *Monticello Sch. Dist. No. 25 v. George L.*, 102 F.3d 895, 901-02 (7th Cir. 1996). Those provisions make the standard of review analysis in IDEA cases somewhat unique. Different standards are applied depending on whether or not the reviewing court receives any new evidence. *Sch. Disc. of Wisc. Dells* v. Z.S., 295 F.3d 671, 675 (7th Cir. 2002). When no new evidence is received by the reviewing court, the administrative decision is owed "considerable deference." *Id*. That is, the administrative decision must be upheld as long as it is supported by substantial evidence. *Id*. Furthermore, "[i]n ordinary cases of judicial review of administrative action . . . the court must defer to the agency's decision if the decision is supported by 'substantial evidence.'" *Sch. Disc. of Wisc. Dells,* 295 F.3d at 674. Judicial review on issues of pure law, however, is plenary. *Id*.

No new evidence was taken in this case (indeed, § 504 does not contain a provision allowing new evidence to be taken as does the IDEA). Therefore, whether the proper standard of review is that provided by the IDEA, or that provided by the more general principles of administrative review, makes no difference in the case at hand. Either way, the proper standard is the "substantial evidence"

2

standard.  In other words, this court must uphold the hearing officer's decision if it was supported by substantial evidence, but on issues of pure law, the court's review is plenary.

**B. FACTS**

The following is a summary of the hearing officer's factual findings, which are for the most part uncontested.

Janie Doe is a resident of Hamilton School District, which is a recipient of federal funds. Janie Doe moved into the school district with her parents prior to entering kindergarten and attended three different elementary schools within the district for kindergarten through fifth grade.  Janie graduated from Woodside Elementary School in 2000 and enrolled in Templeton Middle School for sixth grade.  Janie's elementary school career was unremarkable.  (Findings of Fact, Conclusions of Law, and Order dated August 18, 2004 [hereinafter, "Order"] at 2, ¶ 1.)

In October of her sixth grade year, Janie began feeling anxious at school.  The anxiety was eventually diagnosed as separation anxiety disorder.  The trigger for the onset of the separation anxiety disorder is unclear, but it is undisputed that Janie began experiencing anxiety attacks in school during the fall of her sixth grade year.  (Order at 2, ¶2.)

The anxiety attacks prevented Janie from attending school regularly.  During the fall semester of her sixth grade year Janie missed a number of days of school.  On November 2, 2000, Janie began to see a therapist, Judy Gray, for treatment of her separation anxiety.  The Does met with Janie's guidance counselor, some of her teachers, and other school officials to investigate accommodations for dealing with Janie's separation anxiety.  As a result of this meeting, an accommodation allowing Janie to leave her classroom and go to the school's guidance office whenever necessary was implemented.  (Order at 2, ¶ 3.)

3

Despite the accommodation, Janie's condition became worse. Janie began seeing a psychiatrist, Dr. Gary Schnell. Dr. Schnell prescribed anti-anxiety medication. Hamilton also implemented additional accommodations including: (1) Janie was given a permanent pass to the guidance office; (2) Janie was allowed to sit in the IMC[2] all day; (3) Janie's teachers prepared individual homework assignments to be completed while she stayed in the IMC; (4) Janie was allowed to telephone her parents at any time; and (5) various curricular modifications for Janie's classes were made due to her inability to attend class. (Order at 2-3, ¶ 4.)

In December of 2000, two additional accommodations were implemented. These accommodations were (1) that Janie's guidance counselor, Beth Bushmann, collected Janie's assignments from her teachers and delivered the completed homework to the teachers and (2) Janie moved from the IMC to a small room within the IMC. The accommodations were intended to minimize Janie's contact with her teachers and to alleviate her feelings that she was on display in the IMC. All of the accommodations implemented by Hamilton were done at the recommendation or with the approval of Janie's therapist. (Order at 3, ¶ 5.)

Additional accommodations were implemented during the spring semester of Janie's sixth grade year. These accommodations included: (1) Janie was required to attend her "Allied Courses" (art, chorus, and health class) only when she felt comfortable doing so; (2) Janie received one-on-one assistance for a Content Mastery course; and (3) Janie was required to attend Communication Arts class with her homeroom teacher only when she felt comfortable. (Order at 3, ¶ 6.)

---

[2] The hearing officer's order does not disclose what the acronym "IMC" stands for. It appears that "IMC" refers to the school library. (Tr. at 303-04.)

4

Students at Templeton Middle School are grouped into "houses," with a team of teachers assigned to each house. Janie was placed in the blue house. Janie requested a transfer to the gold house because she thought she might feel more comfortable with the teachers assigned to that house. Janie's request was denied, but Hamilton did offer to transfer Janie to the red house. Janie refused the offer of a transfer to the red house. (Order at 3, ¶ 6.)

Despite the accommodations, Janie was unable for the most part to physically enter her classrooms and, on many days, even enter the school building because of her separation anxiety. One of Janie's parents brought her to school nearly every day and tried to encourage or cajole her to go to school. These efforts met with limited success. At the end of the second quarter of her sixth grade year, Janie's grades were four "D"s, two "C"s, and two "A"s. (Order at 3, ¶ 7.)

In mid-February of 2001, the Does requested that Janie be evaluated for eligibility for special education services under the IDEA. An evaluation was conducted and an eligibility meeting was conducted on April 17, 2001. The conclusion of the Individualized Education Program ("IEP") team was that Janie was suffering from separation anxiety but was not eligible for services under the IDEA. The Does did not request that Janie be evaluated under § 504 and Hamilton did not do so. Regardless of the finding of ineligibility for special services under the IDEA and the absence of an evaluation under § 504, Hamilton nevertheless continued the accommodations that it had implemented for Janie. By the end of the sixth grade, Janie, who had been an average to above-average student in elementary school, failed four of her classes. (Order at 3, ¶ 8.)

During the summer between sixth and seventh grade, Janie and her parents spent time meeting her seventh grade teachers hoping to make Janie feel more comfortable in school. However, Janie's seventh grade year started as her sixth grade year ended. Janie was able to attend school on

5

parts of only two days. Frustrated by their inability to get Janie to attend school, the Does requested homebound instruction for Janie. Hamilton initially suggested that the Does try home schooling Janie. Under Wisconsin law, a student who is home schooled is considered to have withdrawn from the school district. The Does were unable and unwilling to home school Janie and persisted in their request for homebound instruction. Hamilton offered homebound instruction to Janie for a thirty-day period. However, limited homebound instruction was not acceptable to the Does. (Order at 3-4, ¶ 9.)

On or about October 18, 2001, the Does enrolled Janie in the West Suburban Christian Academy. West Suburban Christian Academy is a private school in Waukesha County which features small class sizes. Janie was able to successfully attend her classes at West Suburban Christian Academy for the most part. She missed twelve days of school during the seventh grade. In her father's opinion, Janie was successful at West Suburban Christian Academy because the school was smaller and she trusted her teachers. The Does paid a total of $2,335 for tuition and $515 in fees for Janie to attend West Suburban Christian Academy for the seventh grade. (Order at 4, ¶ 10.)

During seventh grade Janie's feelings of anxiety diminished to the point that she was able to stop taking the prescribed anti-anxiety medication. Janie's parents again enrolled her at West Suburban Christian Academy for the eighth grade. Unfortunately, Janie's feelings of anxiety resurfaced. Janie missed seventy-two days of school during the eighth grade. On days she was absent, Janie's teachers kept in contact with her by telephone and email. Despite her absences, Janie received four "B"s, one "A", and one "C" as final grades. Accommodations provided by the staff at West Suburban Christian Academy for Janie included developing homework projects and

6

assignments. Janie's classmates and teachers also provided encouragement to her. The Does paid a total of $3,015 for tuition and $525 for fees for Janie to attend West Suburban Christian Academy for the eighth grade. (Order at 4, ¶ 11.)

For ninth grade, the Does enrolled Janie at Hamilton High School, the high school for Hamilton School District. In July of 2003, Janie also began seeing a different therapist, Daniel Huber, Ph.D. Hamilton, with input from Dr. Huber and the Does, developed a set of accommodations for Janie. These accommodations included: (1) providing homework; (2) providing Janie with a note allowing her to leave class as needed; and (3) providing Janie with a place to practice the relaxation techniques she had learned. (Order at 4, ¶ 12.)

Janie attended the first day of school as well as one hour of school on September 24, 2003. Other than those two days, Janie was unable to attend any classes during the first quarter of ninth grade. Additional efforts were made to get Janie into school for the second quarter of ninth grade. These efforts included allowing Janie to earn a half credit for work performed during the second quarter, rather than the one full credit for the first semester. Essentially, the second quarter was treated as a fresh start for Janie. (Order at 4, ¶ 13.)

At the start of the second semester, Janie was given a shortened school day. She was allowed to select two classes that she would attend. The classes Janie opted to attend were French and Child Guidance. As an additional accommodation, Janie was given "No Grade" rather than "F"s for her first semester courses. Janie attended classes on seven of the first eight days. On the ninth day of the second semester, a change in Janie's schedule as a result of an assembly caused Janie to break down and she did not attend any of her classes for the remainder of the second semester. (Order at 4, ¶ 14.)

7

On January 9, 2004, the Does requested that Hamilton provide Janie with homebound instruction. A meeting was held in response to this request on February 13, 2004. At that meeting, Hamilton agreed to provide three correspondence courses through the American School for a total of two credits. Hamilton provided a homebound teacher for one hour a week to assist with the correspondence courses. The homebound teacher collected tests and quizzes from Janie and mailed them in. Janie's father testified that the homebound teacher did not provide any direct instruction. As of July 6, 2004, Janie had earned one half credit for the correspondence courses. (Order at 5, ¶ 15.)

Also on January 9, 2004, the Does requested that Janie be evaluated under § 504. A § 504 meeting was held on March 8, 2004. Present at the meeting were the Does, their attorney, Mary O'Neil (a homebound instruction teacher), Murrene Payton (a school social worker), Jerry Zirbel (the school psychologist), Patti Broomell (Janie's guidance counselor), David Furrer (Hamilton High School Principal), Dr. Huber, and Dr. Schnell (by telephone). The team members agreed that Janie's separation anxiety disorder qualified under § 504. The accommodations offered for Janie were basically the ones that had already been implemented. The § 504 plan listed two areas of concern, that Janie was "unable to attend school" and that she "experiences anxiety while in school." (Order at 5, ¶ 16.)

Despite the accommodations, Janie was unable to attend the two classes that required participation, i.e., French and Child Guidance. Because she was unable to attend these classes, she did not earn credit for them. At the end of 9th grade, Janie had only earned the half credit that she received through the correspondence course. In order to graduate from high school on schedule a student should have earned eight credits by the end of 9th grade. The Does requested

8

accommodations that would have enabled Janie to earn credit for her French and Child Guidance courses without attending classes. Hamilton rejected that request. (Order at 5, ¶ 17.)

In an attempt to get Janie to catch up with her classmates in terms of credits, the Does enrolled Janie in classes at Keystone National High School. Keystone National High School is a virtual, online school that is licensed in the state of Pennsylvania and accredited by various accrediting bodies. As of July 6, 2004, Janie had earned three credits through her classes at Keystone and planned to earn an additional three credits. The tuition and textbook fees for the courses Janie had already taken were $1,112. Janie also planned to complete the work for the correspondence courses. Between the correspondence courses and the Keystone courses Janie would have earned eight credits. (Order at 5-6, ¶ 18.)

## C. THE HEARING OFFICER'S LEGAL CONCLUSIONS

After conducting the hearing, the hearing officer made a series of legal conclusions including the following: (1) Janie Doe qualifies as a child with a disability for the purposes of § 504 and has so qualified since the 2000-2001 school year; (2) Hamilton's failure to evaluate Janie under § 504, after she was found to not be eligible for services under the IDEA in 2001, constitutes a violation of § 504; (3) although Hamilton provided various accommodations to Janie which were approved by her doctors and therapists, those accommodations have not provided Janie with a "free and appropriate public education"; (4) Hamilton discriminated against Janie based on her disability and did not provide her a "free and appropriate public education" during her 6th and 7th grade years. Such discrimination constitutes a continuing violation of § 504; (5) the § 504 plan developed for the 2003-2004 school year does not provide Janie with a "free and appropriate public education," and thus constitutes a violation of § 504; (6) although Janie did not enroll in the Hamilton School District

9

for the 2004-2005 school year, if she should enroll, Hamilton is required by § 504 to provide reasonable accommodations for Janie's disability including allowing her to participate in classes without being physically present in the classroom. (Order at 10-11.)

The hearing officer then ordered Hamilton to reimburse the Does for the amounts paid for tuition and fees to enroll Janie in West Suburban Christian Academy and Keystone National High School, as well as to pay the costs for additional courses at Keystone. The hearing officer also ordered Hamilton to amend Janie's § 504 plan, should she re-enroll in the school district, to include an accommodation that Hamilton will provide the necessary equipment to allow Janie to participate in classes by videoconference hookup or a comparable arrangement. (Order at 11.)

## D. DISCUSSION

Hamilton asks the court to reverse the decision of the hearing officer based on three grounds. First, Hamilton contends that the hearing officer's conclusion that Hamilton discriminated against Janie Doe is not supported by the record. Specifically, Hamilton argues that the hearing officer made no finding of "bad faith or gross misjudgment" on Hamilton's part, and that such is an essential element of a § 504 claim. Hamilton argues that, by finding that Hamilton discriminated against Janie without a finding of bad faith or gross misjudgment, the hearing officer misapplied the law. Furthermore, Hamilton argues that the record does not support a finding of bad faith or gross misjudgment on Hamilton's part. Second, Hamilton argues that, in the circumstances at hand, § 504 imposed no duty on Hamilton to evaluate Janie Doe. Finally, Hamilton maintains that, regardless of the lack of an official § 504 evaluation before January of 2004, the accommodations that it provided to Janie were appropriate and met its obligations under § 504.

Section 504 of the Rehabilitation Act of 1973 provides in pertinent part:

10

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794. The implementing regulations pertinent here mirror the language of § 504 and provide that, "[n]o qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives Federal financial assistance." 34 C.F.R. § 104.4(a). A "handicapped person" is defined as "any person who (i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment. 34 C.F.R. § 104.4(j)(1). Hamilton does not contest that Janie Doe is an "otherwise qualified individual with a disability" under § 504, and is a "qualified handicapped person" under the regulations.

The regulations provide further that:

A recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap. . . . For the purpose of this subpart, the provision of an appropriate education is the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34, 104.35, and 104.36.

34 C.F.R. § 104.33. And finally, with regard to evaluation, the regulations provide:

(a) Preplacement evaluation. A recipient that operates a public elementary or secondary education program or activity shall conduct an evaluation in accordance with the requirements of paragraph (b) of this section of any person who, because of handicap, needs or is believed to need special education or related services before

11

taking any action with respect to the initial placement of the person in regular or special education and any subsequent significant change in placement.

34 C.F.R. § 104.35.

**1. Bad Faith or Gross Misjudgment**

The hearing officer concluded that Hamilton violated § 504 without making an explicit finding of bad faith or gross misjudgment on the part of Hamilton. There are two possibilities for this: either the hearing officer thought that a finding of bad faith or gross misjudgment was not necessary, or a finding of bad faith or gross misjudgment is implicit in his finding that Hamilton violated § 504.

Although the hearing officer did not make a specific finding to such effect, in my opinion it is evident from the hearing officer's order that he concluded that discrimination under § 504 could be found solely on the basis of the school district's failure to provide Janie with a "free and appropriate public education." I reach this conclusion for the following reasons. Although in its post-hearing brief Hamilton argued that a finding of bad faith or gross misjudgment was necessary for a finding of discrimination under § 504, nowhere in the order does the hearing officer state any need for such a finding. The hearing officer summarized the elements of a § 504 violation as follows:

> § 504 requires that an otherwise qualified disabled person be permitted to participate in or receive benefits of a school district's program. Thus to establish that the School District violated § 504, the Student must show that she is a disabled person for the purpose of § 504, she is otherwise qualified for the school district's program, and that she was excluded from the program because of her disability.

(Order at 7.) The hearing officer did not further elaborate, and in his legal conclusions states, "[t]he § 504 plan developed for the 2003-04 school year by Hamilton School District does not provide

12

[Janie Doe] a free and appropriate public education. The failure of the plan to provide her a free and appropriate public education constitutes a violation of § 504." (Order at 11.)

The above legal conclusion, along with the marked absence in the hearing officer's order of any criticism of Hamilton's efforts, demonstrates that the hearing officer considered the failure of a school district to provide a "free and appropriate public education" to constitute a violation of § 504 in and of itself. The following excerpt from the hearing officer's order further illustrates this.

> In this case, the School District provided accommodations designed to address the Student's anxiety, but the accommodations did not provide her educational benefit. The objective of everyone concerned was to get the Student back into school and attending classes. The school District staff was unquestionably sensitive to the Student's disability. However, during the times that she was unable to attend classes, the accommodations did little to provide her with significant educational benefit.

(Order at 9.) Based on the foregoing, I am satisfied that, although he did not explicitly state it, the hearing officer concluded that a finding of bad faith or gross misjudgment was not necessary for a finding of a violation of § 504. The court will now consider whether the hearing officer's conclusion was an error of law, as Hamilton contends that it was.

Generally, in order to establish a violation of § 504, a plaintiff must demonstrate that (1) she is an individual with handicaps; (2) she is otherwise qualified; (3) she is excluded from programs solely because of the handicap; and (4) the programs from which she is excluded are operated by an agency that is federally funded. *Byrne v. Bd. of Educ., Sch. of West Allis-West Milwaukee*, 979 F.2d 560, 563 (7th Cir. 1992). The weight of the authority suggests, however, that, at least in the context of the education of handicapped children, either bad faith or gross misjudgment is also necessary for a § 504 violation. *Sellers v. Sch. Bd. of City of Mannassas*, 141 F.3d 524, 529 (4th Cir. 1998) ("[E]ither bad faith or gross misjudgment should be shown before a § 504 violation can be made out,

13

at least in the context of education of handicapped children."); *Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir. 1982) (same); *Wenger v. Canastota Cent. Sch. Dist.*, 979 F.Supp.147, 152 (N.D.N.Y.1997); *Johnston v. Ann Arbor Public Schs.*, 569 F.Supp. 1502, 1506 (C.D. Mich.1983).

In reaching its conclusion that bad faith or gross misjudgment must be shown, the *Monahan* court compared § 504 with the Education for All Handicapped Children Act of 1975 ("EAHCA"), which was later amended and renamed the IDEA. The court stated that "[i]t is our duty to harmonize the Rehabilitation Act and the EAHCA to the fullest extent possible . . . ." *Monahan*, 687 F.2d at 1171. To this end, that court analyzed the language of § 504.

> The language of the[§504] is instructive. It prohibits exclusion, denial of benefits, and discrimination "solely by reason of . . . handicap." Manifestly, in order to show a violation of the Rehabilitation Act, something more than a mere failure to provide the "free appropriate education" required by EAHCA must be shown. The reference in the Rehabilitation Act to "discrimination" must require, we think, something more than an incorrect evaluation, or a substantively faulty individualized education plan, in order for liability to exist. Experts often disagree on what the special needs of a handicapped child are, and the educational placement of such children is often necessarily an arguable matter. That a court may, after hearing evidence and argument, come to the conclusion that an incorrect evaluation has been made, and that a different placement must be required under EAHCA, is not necessarily the same thing as a holding that a handicapped child has been discriminated against solely by reason of his or her handicap. An evaluation, in other words, is not discriminatory merely because a court would have evaluated the child differently.

*Id*. at 1170.

Although this court is not aware of any Seventh Circuit case that expressly adopts the "bad faith or gross misjudgment" formula, the court's holding in *Timms v. Metropolitan School District of Wabash County*, 722 F.2d 1310 (7th Cir. 1983), suggests that the court would reach the conclusion that bad faith or gross misjudgment is necessary to make out a § 504 claim in an educational setting. In *Timms*, the court evaluated the decision in *Monahan* and stated as follows:

14

> [R]egulations promulgated under section 504 by the Secretary of Education require primary and secondary schools that receive federal funds to provide handicapped children a free appropriate public education, 34 C.F.R. § 104.33 (1982). Section 504 and the EAHCA therefore have considerable overlap. We agree with the Eighth Circuit, however, that the Rehabilitation Act is broader than the EAHCA in the range of federally-funded activities it reaches, but narrower in the kind of actions it regulates. *Monahan v. Nebraska*, 687 F.2d 1164, 1170 (8th Cir.1982), *cert. denied*, 460 U.S. 1012, 103 S.Ct. 1252, 75 L.Ed.2d 481 (1983). As *Monahan* notes, *id.*, section 504 is prohibitory, forbidding exclusions from federally-funded programs on the basis of handicap, rather than mandatory, creating affirmative obligations. *See Southeastern Community College v. Davis*, 442 U.S. 397, 410-12, 99 S.Ct. 2361, 2369-70, 60 L.Ed.2d 980 (1979). The EAHCA, by contrast, because of its focus on appropriate education, imposes affirmative duties regarding the content of the programs that must be provided to the handicapped. Because section 504 forbids exclusion from programs rather than prescribing the programs' content it reaches grosser kinds of misconduct than the EAHCA.

*Id*. at 1317-18. The *Timms* court therefore recognized that, although the IDEA and the regulations promulgated under § 504 both require schools to provide children with a "free and appropriate public education," that does not mean that the same action or inaction necessarily constitutes a violation of both statutes. Rather, § 504 is directed toward "grosser kinds of misconduct" than the IDEA. Although the *Timms* court did not ultimately decide the issue, *see id*. at 1318 n.4, in my opinion the court's holding suggests agreement that, while failing to provide a "free and appropriate education" in and of itself may violate the IDEA, something more is required for a violation of § 504.[3]

At least one district court has determined that bad faith or gross judgment is not necessary for a § 504 violation in an educational context. *See O.F. v. Chester Upland Sch. Dist.*, 246 F.Supp.2d 409, 420 (E.D. Pa. 2002). That court based its holding on Third Circuit Court of Appeals

---

[3] The posture of this case is somewhat unusual because although the dispute relates to educational accommodations provided by a school, compliance with the IDEA was not at issue in the hearing, nor is it at issue here. More commonly a plaintiff raises claims based on both the IDEA and § 504.

15

precedent stating that a plaintiff in a § 504 case "need not prove that defendants' discrimination was intentional." *Id.* (citing *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 253 (3rd Cir. 1999)). Indeed, *Ridgewood* followed *W.B. v. Matula*, 67 F.3d 484 (3rd Cir.1995), which held that

> plaintiffs "need not establish that there has been an intent to discriminate in order to prevail under § 504." There appear to be few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition. Indeed, the regulations implementing § 504 adopt the IDEA language, requiring that schools which receive or benefit from federal financial assistance "shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction."

*Matula*, 67 F.3d at 492-93 (citations omitted).

It appears then, at least if the *O.F.* court has interpreted the Third Circuit Court of Appeals precedent properly, that the Circuit Courts of Appeals are split as to whether bad faith or gross misjudgement is a prerequisite for a § 504 violation in the particular context of the education of handicapped children. The Fourth and Eighth Circuits have determined that it is required, *Sellers* and *Monahan, supra,* while the Third Circuit may have determined that it is not. Furthermore, it appears that the *O.F.* court's holding that bad faith or gross misjudgment need not be shown is based on the conclusion that requiring such a showing is inconsistent with holding that discriminatory intent need not be shown.

There is indeed a consensus that a plaintiff need not show discriminatory intent to establish a § 504 violation. *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 846-47 (7th Cir. 1999) (so holding and collecting cases from other circuits). Moreover, *Washington*, as well as *Alexander v. Choate*, 469 U.S. 287 (1985) (the Supreme Court case which has been interpreted to establish that discriminatory intent is not needed for a violation of § 504) were both decided after *Monahan* and *Timms* were decided. The question that then presents itself is, by determining that

16

discriminatory intent need not be shown, have *Choate* and *Washington* done away with the requirement that a plaintiff must show bad faith or gross misjudgment in the specific context of the education of a handicapped child? The *O.F.* court apparently decided this question in the affirmative. Stated another way, can it be consistently said that discriminatory intent is not required, yet a showing of bad faith or gross misjudgment is required?

*Washington* itself does not address the question. In *Washington*, the court did not deal directly with the education of a handicapped student, but rather with the student's eligibility for extracurricular activities, specifically, athletics. Therefore, the fact that *Washington* did not require a showing of bad faith or gross misjudgment does not mean that such would not be required in the specific context of a handicapped student's education. The court's discussion regarding discriminatory intent, however, is instructive. The court stated:

> This court previously has recognized that a plaintiff making a claim under the Rehabilitation Act need not prove an impermissible intent. *See McWright v. Alexander*, 982 F.2d 222, 228-29 (7th Cir.1992) (holding that disparate impact claims are cognizable under the Rehabilitation Act). . . . Although the Supreme Court has not held squarely that a plaintiff need not prove discriminatory intent, it has implied that requiring such proof would be contrary to the intent of Congress. *See Alexander v. Choate*, 469 U.S. 287, 295-97, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). In *Choate*, the Court indicated that there is strong support in the legislative history for the proposition that the Rehabilitation Act was not intended to prohibit solely intentional discrimination. "Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference-of benign neglect." *Id*. at 296, 105 S.Ct. 712. The Court also noted that "much of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult if not impossible to reach were the Act construed to proscribe only conduct fueled by a discriminatory intent."

*Washington*, 181 F.3d at 486.

In my opinion, the requirement that bad faith or gross misjudgment be shown in the specific context of the education of handicapped children is not contrary to not requiring discriminatory intent

17

for a § 504 violation. First of all, as a general proposition, "bad faith or gross misjudgment" is not synonymous with intent. There may be a situation where an actor acts in bad faith, but not intentionally. *See, e.g., Claiborne v. Wisdom*, 414 F.3d 715, 721 (7th Cir. 2005) (holding in a different context that "extremely negligent conduct, like reckless and indifferent conduct" might constitute bad faith). Furthermore, there might be a situation where an actor acts with discriminatory intent, but not in bad faith. For example, it might be a person's heart-felt belief that it is always in disabled students' best interest to be excluded from the regular classroom. Although excluding students from the classroom for that reason involves discriminatory intent, and indeed we might say that such exclusions involve "gross misjudgment," we would not necessarily say that such constitutes "bad faith." Moreover, it is evident from the very meaning of the term "gross misjudgment," that the conduct involved need not be intentional. All that is required is that the judgment be badly mistaken or off the mark.

With this in mind, then, I will turn to the specific context at hand. As the quotation from *Washington* indicates, the reasoning behind not requiring a showing of discriminatory intent for a § 504 violation is that discrimination against the disabled is "most often the product, not of invidious animus, but rather of thoughtlessness and indifference-of benign neglect." But in the specific situation at hand, those concerns are nevertheless adequately addressed when there is a requirement that bad faith or gross misjudgment be shown. This is so because the persons who run public schools already have a heightened duty toward their students. Because educators are expected to look out for the best interest of their students, if they are acting in good faith, then they are not indifferent to or neglectful of the students. Indeed, if educators are found to be indifferent or neglectful, then the bad faith or gross misjudgment standard is likely to be met. On the other hand, the primary reason

18

for requiring a showing of bad faith or gross misjudgment, i.e., that well-intentioned educators will often disagree as to the educational needs of a handicapped child, remains relevant.

I therefore find that it is not inconsistent to say that discriminatory intent is not required, yet a showing of bad faith or gross misjudgment is required, at least in the context of the education of handicapped children. The terms themselves are not contradictory, and concerns about neglect and indifference toward the disabled are still adequately protected by such a formula. The requirement that bad faith or gross misjudgment be shown, after all, is really just a way of ensuring that good faith decisions by educators do not become "discrimination" just because a court ultimately decides that a different course was necessary. This is not the same as requiring a showing of discriminatory intent. Further support for this conclusion comes from the fact that other courts have maintained the bad faith or gross misjudgement requirement long after *Choate* was decided. *See, e.g., Sellers v. Sch. Bd. of City of Mannassas*, 141 F.3d 524, 529 (4th Cir. 1998); *Hoekstra v. Independent Sch. Dist. No. 283*, 103 F.3d 624, 626 (8th Cir. 1996).

In summary, the weight of authority holds that a finding of bad faith or gross misjudgment is necessary for a § 504 violation in the context of the education of handicapped children. Although the Seventh Circuit Court of Appeals has not to date decided the issue, its favorable treatment in *Timms* of the *Monahan* court's interpretation of the differences between § 504 and the IDEA (EAHCA) suggests agreement with that requirement. And finally, I conclude that the *Washington* court's holding that discriminatory intent is not necessary for a § 504 violation is not contrary to requiring a showing of bad faith or gross misjudgment in the context of education of handicapped children.

Case 2:04-cv-00876-WEC   Filed 11/29/05   Page 19 of 31   Document 29

For all of the aforementioned reasons, I conclude that the hearing officer committed a legal error when he found that Hamilton violated § 504 based solely on his determination that Janie Doe was not provided a "free and appropriate public education." Before finding a violation of § 504, it was necessary for the hearing officer to make a finding of bad faith or gross misjudgment on Hamilton's part.

The record in this case discloses that while Janie was a student at Hamilton, the school district made repeated efforts and accommodations on her behalf. According to the factual conclusions of the hearing officer, during the sixth grade those accommodations included allowing Janie to leave her classroom and go to the school's guidance office whenever necessary, and later giving Janie a permanent pass to the guidance office; allowing Janie to sit in an area outside of her class room for the entire day; having Janie's teachers prepare individual homework assignments to be completed while she was outside the classroom; allowing Janie to telephone her parents at any time; approving various curricular modifications; having Janie's guidance counselor collect her assignments from her teachers and deliver the completed homework; requiring Janie to attend certain courses only when she felt comfortable doing so; and providing one-on-one assistance for another course.

During her seventh and eighth grade years, Janie attended school outside of the school district for the most part. When she returned for ninth grade, Hamilton again made various accommodations. The hearing officer found that during ninth grade the accommodations provided to Janie included giving her a note allowing her to leave class as needed, providing a place where Janie could practice relaxation techniques which she had learned, giving Janie a "new start" for the second quarter when the first quarter did not go well, giving Janie a shortened school day and allowing her to select the

20

two classes that she would attend, giving Janie marks of "No Grade" rather than "F" for her first semester courses, providing three correspondence courses through a different school, and providing a homebound teacher for one hour a week to assist with the correspondence courses.

Moreover, the hearing officer found that meetings were conducted in order to decide on these accommodations and that the accommodations that were implemented were at the recommendation of, or with the approval of, Janie's therapist. In short, nothing about the overall course of conduct taken and the accommodations made by Hamilton suggest that it was acting in bad faith or making gross misjudgments in regard to Janie. That having been said, however, there was a short list of accommodations suggested by the Does which Hamilton refused to implement. The court will turn its attention to these proposed accommodations.

The first accommodation proposed by the Does, but refused by Hamilton, was the Does' request that Janie be assigned to a particular "house" of teachers. Hamilton refused to make that accommodation but offered a different "house," which the Does in turn refused. Second, at the beginning of seventh grade, before Janie enrolled at West Suburban Christian Academy, Hamilton offered a limited amount of homebound instruction which the Does found unacceptable. Third, in the ninth grade, the Does requested that Janie be allowed to earn credit for her French and Child Guidance courses without attending classes, but Hamilton refused to allow her to do so.

The first suggested accommodation which was refused by Hamilton, switching Janie from the blue house to the gold house, was not a focus of the parties' briefs. The transcript testimony of Mr. Doe reveals that Janie wanted to be transferred to the gold house, but the Does' request to have her transferred was denied by Hamilton because, although there was an opening in the gold house, that opening was already reserved for someone with "special needs." (Tr. 306.) Hamilton offered

21

instead to transfer Janie to the red house, but Janie rejected that transfer because "she had witnessed teachers being mean to students in the hallway, and it wasn't anymore different to her than was the blue house." (Tr. 307.) Hamilton's refusal to transfer Janie to the house of her choice does not suggest bad faith or gross misjudgment on the school district's part, especially if the opening in that house was reserved for a particular student or type of student. Indeed, Hamilton's offer to transfer Janie to a third house demonstrates that it did not turn a deaf ear to the Does' request.

As to Hamilton's offer of homebound instruction at the beginning of the seventh grade, the hearing officer found that Janie was offered homebound instruction for thirty days. (Order at 4, ¶ 9.) The parties disagree as to whether Hamilton's offer was for thirty days, and only thirty days, or thirty days at the outset, with the possibility of more homebound instruction upon further evaluation. Indeed, the record discloses that Mr. Doe thought the thirty day offer was not renewable (Tr. 312-14.), while Charlene DeGroot, the Supervisor of Special Services at Hamilton, testified that students are offered homebound instruction for a period of time, and continued need is then assessed at the end of that period. (Tr. 251.)

The hearing officer did not definitively resolve this factual issue. He simply concluded that thirty days of homebound instruction was offered, and that limited homebound instruction was not acceptable to the Does. In any event, nothing about the offer of thirty days of homebound instruction suggests bad faith or gross misjudgment on the part of Hamilton. Indeed, it would seem odd if Hamilton would have offered perpetual homebound instruction, particularly when there was a consensus among all interested parties that the ultimate goal was to have Janie return to school.

The last proposed accommodation pertains to the second semester of Janie's ninth grade year. At the beginning of the semester Janie enrolled in two classes at the school, French and Child

Case 2:04-cv-00876-WEC   Filed 11/29/05   Page 22 of 31   Document 29

Guidance, and was also taking additional correspondence courses from home. As the semester progressed and Janie was unable to attend school with regularity, the Does asked that Janie be allowed to earn credit for French and Child Guidance without having to attend the classes. The school district determined that, with regard to those particular classes, participation in class was essential. David Furrer, the principal of Hamilton High School, testified that a component of the Child Guidance course involved hands on work with preschool age children. (Tr. 184.) The students in that class were placed in groups of four and each student "assumed a particular role in a planning and instructional delivery process." (Tr. 183.) Mr. Furrer also testified that the teachers of the French and Child Guidance courses thought that participation was necessary for those courses, and that he thought that not waiving participation was an "educationally appropriate position." (Tr. 183-84.)

According to Patricia Broomell, a guidance counselor at Hamilton High School, Janie was enrolled in French and Child Guidance in part because they were classes that Janie wanted to take, and might therefore provide incentive for her to go to school. (Tr. 122.) At the same time, Janie was taking correspondence classes at home, and the school district provided homebound instruction in conjunction with the correspondence classes. (Tr. 123.) According to a letter from Dr. Gary Schnell, Janie's psychiatrist, dated February 9, 2004, the current plan for Janie was that Dr. Schnell would continue medication interventions, Janie would continue individual therapy with Dr. Huber, and Janie, along with her parents and Attorney Engel would "continue to work with [Hamilton] in efforts to promote regular attendance. This will require flexibility and hopefully [Janie] can consistently come to school for two classes per day and this can eventually be increased to three classes a day and then the entire day." (Ex. 22.)

23

Dr. Daniel Huber, Janie's therapist, testified that he did not agree with the approach of Janie's being required to be in school for some of her classes. (Tr. 434-35.) Dr. Huber characterized that approach as one of acclimating Janie to being in school so that over time she would be able to control or manage her anxiety. (Tr. 434.) Dr. Huber testified that, "I'm not opposed to that type of approach, and I agreed to using that but not as a front line, because I think her anxiety and her tension were too strong for that to happen. I think I recall reading in the notes that I agreed that that was a good thing to do, but that would be later on once we could actually get her into the school and feel comfortable." (Tr. 434-35.)

Based on the testimony summarized above, it is apparent to me that the educational personnel involved were trying to develop a plan that would work for Janie. The hope was that by requiring Janie to be in school part of the time, and selecting classes that she would enjoy, Janie would come to school, and in time feel more comfortable there. The plan did not work, and in time it became apparent that Janie was not going to be able to attend the two classes at school often enough to obtain credit. The Does then requested that Janie be allowed to earn credit for the classes without attending, but Hamilton's refusal to allow this does not demonstrate bad faith or gross misjudgment. It was not unreasonable for the school district to determine participation to be essential for French and Child Guidance. For obvious reasons, classroom participation is a very important aspect of learning a foreign language, and Hamilton High School's Child Guidance course consisted, in part, of hands-on work with children.

To be sure, Dr. Huber testified that he did not think that the approach taken at the outset of the semester, requiring Janie to be at some classes while working on others at home, was the best approach. But a disagreement among educational professionals as to the best way to accommodate

24

a student does not demonstrate bad faith or gross misjudgment. In short, nothing about the plan at the outset of the second semester of ninth grade, or Hamilton's determination that French and Child Guidance could not be completed without class participation, suggests bad faith or gross misjudgment on Hamilton's part.

In the alternative, the Does argue that bad faith can be shown by what they characterize as Hamilton's refusal to follow the law. (Defs.'s Br. at 26.) In essence, the Does argue that Hamilton displayed bad faith by violating § 504. The argument is circuitous. This court has determined that bad faith or gross misjudgment is necessary for finding a violation of § 504, at least in the particular circumstances at hand. Bad faith cannot therefore be premised on violating § 504, because there is no violation unless bad faith or gross misjudgment is already shown.

The Does also argue that bad faith can be shown by Hamilton's refusal to conduct a § 504 evaluation of Janie before January of 2004. Hamilton's duty to conduct an evaluation will be discussed further below. But, for the purpose of determining whether the lack of an evaluation constitutes bad faith or gross misjudgment, it suffices to say that the hearing officer found that nobody requested a § 504 hearing before that date. And despite the lack of a hearing, Hamilton provided numerous accommodations to Janie. This does not suggest bad faith or gross misjudgment.

For all of the aforementioned reasons, I conclude that nothing in the record suggests bad faith or gross misjudgment on Hamilton's part. The hearing officer committed an error of law in not requiring a showing of bad faith or gross misjudgment before finding a violation of § 504. Had the hearing officer applied the correct law, he would have been obliged to find that Hamilton did not discriminate against Janie in violation of § 504 precisely because there was insufficient evidence to show bad faith or gross misjudgment on Hamilton's part.

25

## 2. Duty to Evaluate

The § 504 implementing regulations contain the requirement that

> [a] recipient that operates a public elementary or secondary education program or activity shall conduct an evaluation in accordance with the requirements of paragraph (b) of this section of any person who, because of handicap, needs or is believed to need special education or related services before taking any action with respect to the initial placement of the person in regular or special education and any subsequent significant change in placement.

34 CFR § 104.35(a). The Does argue, and the hearing officer found, that Hamilton violated § 504 by failing to evaluate Janie under § 504 after she was found to not qualify for special education services under the IDEA in April of 2001. (Order at 10, ¶2.)

Hamilton argues that the hearing officer's finding was erroneous because § 504 did not require it to conduct an evaluation under the circumstances of this case. Hamilton points to the language of 34 CFR § 104.35(a), which requires an evaluation only if a student "needs or is believed to need special education or related services." According to Hamilton, this means that a § 504 evaluation is required only if a student would qualify, or is believed to qualify, for "special education or related services" as those terms are defined under the IDEA. In other words, a § 504 evaluation is only required if the student would qualify for an Individualized Education Plan under the IDEA, and because it was previously determined that Janie did not qualify for such services, no § 504 evaluation was required. (Pl.'s Br. at 12.)

I am not persuaded by Hamilton's argument. It is evident that some students might qualify for services under § 504, but not under the IDEA. Indeed, Janie is such a student. Furthermore, § 104.35 is a regulation promulgated to implement § 504, not to implement the IDEA. "A statute and its implementing regulations should be read as a whole and, where possible, afforded a harmonious

26

interpretation." *Carmichael v. Payment Center, Inc.*, 336 F.3d 636, 640 (7th Cir. 2003). Keeping in mind that the purpose of § 104.35 is to implement § 504, a plain reading of the regulation leads to the conclusion that those persons responsible for operating a public school must conduct an evaluation if they know or believe that a student would qualify for services under § 504. It would not make sense for the regulation to require those persons to conduct an evaluation under § 504 only when they believe that a student qualifies for services under a different statute, the IDEA, and not when they believe that a student qualifies for services under the statute which it implements. Accordingly, I conclude that § 104.35 requires an evaluation when it is believed that a student would require special education or other § 504 accommodations.

Based on this conclusion, I find that Hamilton did have an obligation to conduct a § 504 evaluation, at least by April of 2001. At that point in time Hamilton had determined that Janie did not qualify for special education under the IDEA, but it was nevertheless providing Janie with an array of accommodations. That Hamilton was providing such accommodations would suggest that Hamilton believed that Janie qualified for accommodations under § 504 even if she did not qualify for "special education." Indeed, Hamilton does not now contest that Janie qualifies under § 504, and there is no evidence that her disability has substantially changed since April 2001.

However, it is unclear to me that Hamilton's failure to conduct an official § 504 evaluation is material if § 504 is, in all other regards, complied with. Hamilton argues that it did what it was supposed to do under § 504. Specifically, it consulted with all of the appropriate individuals and came up with a set of accommodations for Janie, and then continuously reviewed the accommodations. (Pl.'s Br. at 14-16.)

27

In support of this argument, Hamilton points to the testimony of Dr. Brighan, who oversees §504 implementation for the Milwaukee Public Schools. Dr. Brighan testified that in Janie's case, a "§ 504 team" ideally would have included school personnel and her treating psychiatrist and psychologist and that those people would be brought together to develop accommodations for her. (Tr. 582.) But as the record reflects, and the hearing officer found, decisions regarding accommodations in Janie's case were made by consultation among school personnel and Janie's doctors. Perhaps most tellingly, the hearing officer found that, once an official § 504 meeting was held on March 8, 2004, with all of the appropriate people present, "the accommodations offered for [Janie's] disability were basically the ones that had already been implemented." (Order at 5, ¶ 16.) In my opinion, this illustrates that, although the hearing officer found that there would have been differences had Janie been formally evaluated under § 504 in 2001, i.e., that Janie would have had a § 504 plan with "express goals" (Order at 9), those differences would not have been material. After all, the formal § 504 evaluation and meeting, once conducted, yielded the same results as the previous informal procedures.

## 3. Damages

With all of the above in mind, I will now turn to the damages awarded and orders issued by the hearing officer. The hearing officer first ordered Hamilton to reimburse the Does for the tuition and fees they paid to enroll Janie in the West Suburban Christian Academy. According to the hearing officer, this order was necessary to remediate the § 504 violation he found because Hamilton "discriminated against [Janie] based on her disability and did not provide her a free and appropriate public education during her 6th and 7th grade years." (Order at 10, ¶ 3.) Based on my conclusion above, that had the hearing officer applied the correct law, he would have been obliged to find that

28

Hamilton did not discriminate against Janie in violation of § 504 because there was insufficient evidence from which to show bad faith or gross misjudgment on Hamilton's part, this award was erroneous and must be reversed.

The hearing officer next ordered Hamilton to reimburse the Does for the amount they paid to enroll Janie in classes in Keystone National High School, as well as the cost for additional courses through Keystone equaling three additional credits. The hearing officer made this award because "[t]he § 504 plan developed for the 2003-04 school year by the Hamilton School District does not provide [Janie] a free and appropriate public education. The failure of the plan to provide her a free and appropriate public education constitutes a violation of § 504." (Order at 11, ¶ 4.) For the same reason stated with regard to the hearing officer's first award, this award was also erroneous and must be reversed.

Finally, the hearing officer ordered Hamilton to amend Janie's § 504 plan, should Janie return to Hamilton during the 2004-05 school year, to include an accommodation that will provide the necessary equipment to enable Janie to participate in classes by a videoconference hookup or comparable arrangement. The hearing officer did not specifically state what this award was based on. However, it is apparent that this order was also based on the hearing officer's finding that Hamilton had violated § 504 by failing to provide Janie with a free and appropriate public education. In the "Discussion" section of the order, the videoconference hookup is discussed in reference to what accommodations would be necessary for Janie to receive a free and appropriate public education. (Order at 9-10.) The proposal of a videoconference hookup had to do with the appropriateness of the § 504 plan that was currently in place for Janie, and not the lack of an

Case 2:04-cv-00876-WEC   Filed 11/29/05   Page 29 of 31   Document 29

evaluation at an earlier date. Therefore, for the same reason stated with regard to the other damage awards, this order was also erroneous and must be reversed.

In summary, although I find that Hamilton was under an obligation to evaluate Janie under § 504 in 2001, its failure to do so was not material. Indeed, none of the hearing officer's awards or orders were based on Hamilton's failure to evaluate. Furthermore, for all of the reasons discussed above, the hearing officer's finding that Hamilton otherwise violated § 504 was erroneous. The hearing officer's decision, and the orders and damages awarded thereon, must therefore be reversed.

## II. ADA

The Does claim that Hamilton has also violated the Americans with Disabilities Act. The Does' ADA claim is based on the argument that Hamilton did not provide Janie with reasonable accommodations as required by the Act and accompanying regulations. Title II of the ADA provides that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The provisions of Title II of the ADA are similar to § 504. Indeed, "Title II of the ADA was modeled after § 504 of the Rehabilitation Act; the elements of claims under the two provisions are nearly identical, and precedent under one statute typically applies to the other." *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 845 n.6 (7th Cir. 1999).

There is no dispute that Janie is a "qualified individual with a disability" under the ADA. But because precedent under § 504 applies to the Does' ADA claim, it must fail for the same reasons that their § 504 claim fails. Just as a finding of bad faith or gross misjudgment is necessary for a § 504 violation in the context of the education of handicapped children, the same is true under the ADA.

30

*See, e.g., E.W. v. Sch. Bd. of Miami-Dade County*, 307 F.Supp.2d 1363, 1370 & n.28 (S.D. Fla. 2004). And as discussed above, the record does not support any such finding.

### III.  CONCLUSION AND ORDERS

In conclusion and for all of the aforementioned reasons, the hearing officer's decision and order will be reversed and judgment will be entered in favor of the plaintiff.

**NOW THEREFORE IT IS ORDERED** that the order issued by hearing officer Mark J. Kaiser on August 18, 2004, be and hereby is **REVERSED**;

**IT IS FURTHER ORDERED** that the defendants' counterclaim based on the Americans with Disabilities Act be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the clerk of court enter judgment accordingly and in favor of Hamilton School District.

**SO ORDERED** this <u>29th</u> day of November 2005, at Milwaukee, Wisconsin.


/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

31

Case 2:04-cv-00876-WEC   Filed 11/29/05   Page 31 of 31   Document 29